**STATE OF MISSOURI and Highway Commission of Missouri, Plaintiffs,**

v.

**STUPP BROS. BRIDGE & IRON CO., et al., Defendants.**

No. 14277–1.

United States District Court
W. D. Missouri, W. D.

Nov. 22, 1965.

**170**

James C. Wilson, Kansas City, Mo., Norman H. Anderson, Atty. Gen., State of Missouri, for plaintiffs.

F. Russell Millin, U. S. Atty., and Calvin K. Hamilton, Asst. U. S. Atty., amicus curiae, for the United States.

Brown, Douglas & Brown, St. Joseph, Mo., for St. Joseph Structural Steel Co.

Spencer, Fane, Britt & Browne, Kansas City, Mo., for Kansas City Structural Steel Co.

Watson, Ess, Marshall & Enggas, Kansas City, Mo., for Havens Structural Steel Co.

E. C. Hartman, R. H. McRoberts, Stuart Symington, Jr., St. Louis, Mo., and Watson, Ess, Marshall & Enggas, Kansas City, Mo., for Stupp Bros. Bridge & Iron Co.

JOHN W. OLIVER, District Judge.

This civil anti-trust case pends on defendants' motion (1) for summary judgment dismissing the entire action predicated on the theory that (a) as to most of the structural steel involved, plaintiffs were indirect purchasers lacking capacity to sue under Section 4 of the Clayton Act (15 U.S.C.A. § 15); and (b) as to the remainder of the structural steel involved, no conspiracy can be said to exist because only one defendant—Stupp Bros. Bridge & Iron Company—was capable of handling the fabrication on particular projects which did involve direct pur-

chases; and on (2) a motion for partial summary judgment based on the alleged ground that the plaintiffs "passed on" a substantial portion of the excessive overcharges to the United States under the Federal Aid to Highways Act.

Pursuant to various pre-trial conferences and orders, the parties have filed two separate stipulations. Other facts are presented by various affidavits filed by both sides.

The legal questions presented have been ably briefed at length (the briefs total over 150 pages). We have also had the benefit of an *amicus curiae* brief filed by the United States. We have studied those briefs and the numerous cases cited therein. We now state our reasons why the relief prayed for in both defendants' motions should be denied.

*I. Section 4 of the Clayton Act*

The stipulated facts upon which defendants contend they are entitled to summary judgment in connection with their first point were stated in defendants' brief as they appear in Appendix A attached hereto. Plaintiffs do not quarrel with defendants' paraphrase of the stipulated facts but suggest that significant facts were omitted from defendants' statement. Plaintiffs' supplementary statement of stipulated facts is attached as Appendix B.

Defendants' legal theory concerning the meaning of Section 4 of the Clayton Act is stated as follows:

> This first section of defendants' motion is based on the fact that plaintiffs had no dealings with defendants in the transactions claimed to give rise to plaintiffs' claim for treble damages, that plaintiffs purchased no structural steel from defendants (except on Projects Nos. IN 891(5)c, IN 891(5)d, I 892(17), I 229(16)b, and I 229(16)c where Stupp Bros. was the prime contractor. See Sec. II, *infra*.) that the structural steel allegedly affected by defendants' claimed conspiracy was purchased by prime contractors and subcontractors for use in the construction of new steel bridges, which

were in each instance themselves part of and integrated into a larger highway project. These facts are undisputed and are recited in Stipulation No. 1. Based on these facts plaintiffs are too remote from the alleged conspiracy to sue for the incidental injury they allegedly incurred. (P. 7 of Defendants' Brief [1]).

Defendants' argument is at least two-pronged. We shall state defendants' arguments in considerable detail because of the recurring presentation of some facet of the pass-on theory in the trial of civil anti-trust cases.

Defendants contend that "indirect purchasers may not maintain private anti-trust suits" (p. 8 D.Br.) and that "the cases rejecting the 'pass on' doctrine establish that plaintiffs have no standing to maintain this suit" (p. 25 D.Br.).

Defendants also argue that "the rule of damages in private anti-trust actions is governed by Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 534 [38 S.Ct. 186, 62 L.Ed. 451] (1918)" (p. 7 D.Br.) ; and that "two relevant lines of authority have developed from the application of the Darnell-Taenzer principle to cases brought under Section 4 of the Clayton Act" (p. 8 D.Br.). Defendants contend that one line of cases is exemplified by Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 7th Cir. 1963, 315 F.2d 564, cert. denied Illinois v. Commonwealth Edison Co., 375 U.S. 834, 84 S.Ct. 64, 11 L.Ed.2d 64, and that the other line of cases is exemplified by Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 7th Cir. 1964, 335 F.2d 203.

In regard to the latter, defendants assert that the pass-on defense cases require a further holding that, "except in extremely rare and unusual situations not here relevant [an obvious reference to the Oil Jobber cases], the first purchaser—and not subsequent purchasers—is the only one who can institute and prosecute a suit for alleged conspiratorial overcharges" (p. 8 D.Br.).

Defendants insist that there must be a "direct injury before one may sue under Section 4 of the Clayton Act" (p. 14 D. Br.) and that "one who derives his injury through a contract with one directly injured is too remote from the violation to recover any damage it incidentally caused him" (p. 14 D.Br.).

Defendants' review of typical bid tabulations attached to Stipulation No. 1 (Exhibits D to X, inclusive, attached thereto) is tendered in support of its argument that those tabulations and defendants' review "show that plaintiffs were not directly injured in their business and property as required by Section 4 of the Clayton Act and that any injury suffered by plaintiffs was causally connected to the alleged conspiracy of defendants" (p. 23 D.Br.).

In specific regard to "pass-on", defendants contend that "the cases rejecting the 'pass on' doctrine are merely the other side of the coin that one indirectly injured can not sue" (p. 25 D.Br.). Defendants add that "the 'pass on' cases establish that, except in the rare Oil Jobber case situation, which is not this one, the party first to pay an overcharge is the party to sue to recover it" and that because "plaintiffs were the second or third parties to pay [they] therefore have no cause of action" (D.Br. p. 37).

Plaintiffs insist at the outset that "this is not a passing on case" (page 2 of Plaintiffs' Brief [2]). Plaintiffs argue that:

> Defendants are charged with having participated in an unlawful scheme in violation of the Federal Antitrust Laws, which was directed solely against plaintiffs. This is not a situation in which plaintiffs merely happened to be somewhere in the target area. This is a case where plaintiffs were the only target and consequently plaintiffs were not only hit but they were the only bull's eye on which aim was taken. In such circumstances discussion of the passing-on doctrine or the law relating

---

1. Referred to hereinafter as D.Br.

2. Referred to hereinafter as P.Br.

to indirect purchasers is irrelevant. (P. 2 P.Br.)

Both parties cite Judge Boldt's decision in State of Washington et al. v. General Electric Co. et al., W.D.Wash., 246 F.Supp. 960, decided March 31, 1965. Defendants, in anticipation of plaintiffs' reliance on that case, contend that this case "is unlike State of Washington v. General Electric" (P. 28 D.Br.).

Plaintiffs, on the other hand, and as anticipated by the defendants, argue that "the case most nearly 'on all fours' with the instant case is State of Washington et al. v. General Electric et al., (P. 8 P. Br.); that such case "is practically identical to the present case" (P. 16 P.Br.); and that "precisely the same situation [presented by this case] was considered by Judge Boldt in the State of Washington case" (P. 31 P.Br.).

Judge Boldt stated the factual situation involved in the State of Washington case as follows:

> Briefly stated, plaintiff utility district awarded a contract for an electric power project which included a dam, a hydro-electric power plant and related transportation facilities to Grant County Contractors, a joint venture apparently organized to bid on plaintiff's project. The ten generators which are the subject of this motion were purchased from defendant General Electric by Contractors for use as part of the much larger project. General Electric was fully aware that Contractors intended to install the generators in the Grant County project and even actively solicited the order from the utility district and its power customers.

As an alternate ground of decision in support of his action denying defendants' motion for summary judgment, Judge Boldt held that "this Court is unwilling to deny plaintiff its right to sue merely because it purchased the equipment through a third party rather than directly from the manufacturer."

We are of the same view. We are of the further opinion that Judge Boldt, most appropriately focused and directed attention to the language of the statute, which he quoted. In ruling cases presenting the sort of questions presented by this case, to use Judge Boldt's words, "[t]he statutory language * * * should * * * be borne in mind."

Indeed, we believe that the language of the statute is both the point of beginning and the point of ending for any meaningful analysis of the basic question presented by the first point of defendants' motion.

Section 4 of the Clayton Act (15 U.S. C.A. § 15) provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

The language of the present statute is but a codification of a similar section enacted by the Act of July 2, 1890, c. 647, § 7, 26 Stat. 210. As originally enacted, its operation was, of course, restricted to the particular act cited (see Codification section under Historical Note to 15 U.S. C.A. § 15).

Mr. Justice Holmes' decision in Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906), noted that a city was a "person" within the comparable language of original Section 7 of the Act of July 2, 1890, by reason of the express provision of Section 8 of that Act. In determining that "the facts gave rise to a cause of action under the Act of Congress," Mr. Justice Holmes stated that "[t]he city was * * * injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe." Mr. Justice Holmes added that "[a] person whose property is diminished by a payment of money wrongfully induced is injured in his property."

United States v. Cooper Corp., 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941), construed what is now Section 4 of the Clayton Act as its substance originally

appeared in Section 7 of the Sherman Act. That case determined that the United States was not a "person" within the meaning of the statute. So far as this case is concerned, that case teaches that "we are to read the statutory language in its ordinary and natural sense, and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment, but, as well, by all other available aids to construction" (312 U.S. at 605, 61 S.Ct. at 744).

It was further held that "it is not our judicial function to engraft on a statute additions which we think the legislature might or should have made" (312 U.S. at 605, 61 S.Ct. at 744).

And in State of Georgia v. Evans, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942), holding that a State, as distinguished from the United States, is a "person" within the meaning of what is now Section 4 of the Clayton Act, Mr. Justice Frankfurter held that "[r]eason balks against implying denial of such a remedy [the civil remedy of treble damages] to a State which purchases materials for use in building public highways" (316 U.S. at 162, 62 S.Ct. at 974). He added that "[n]othing in the Act, its history, or its policy, could justify so restrictive a construction of the word 'person' in § 7 as to exclude a State," and that "[s]uch a construction would deny all redress to a State, when mulcted by a violator of the Sherman Law, merely because it is a State." (316 U.S. at 162–163, 62 S.Ct. at 974).

We recognize, of course, that none of these cases involved the specific factual situation upon which defendants base their argument. These cases are cited to state the rules of decision applicable to our construction of the statute. These cases teach that we are to read Section 4 of the Clayton Act in its ordinary and natural sense; that we are to consider its history and its policy; that we are to avoid restrictive constructions inconsistent therewith; and that we are not to engraft additions on the statute that the Congress did not see fit to enact.

So far as the policy of the Congress is concerned, prosecution of private treble-damage actions under Section 4 of the Clayton Act has long been recognized as a supplement to government enforcement of the anti-trust laws of the United States. See, for example, United States v. Borden Co., 347 U.S. 514 at 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954). That policy requires, to use the more recent language of Radovich v. National Football League, 352 U.S. 445, 454, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957), that we "should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws."

Twice this year the Supreme Court has recognized that "Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." See Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311 at 318, 85 S.Ct. 1473, at 1477, 14 L.Ed.2d 405 (1965), quoted in Leh v. General Petroleum Corp., 86 S.Ct. 203, decided November 8, 1965. The former case holds that such policy requires that courts construe particular sections of the anti-trust law in a manner that would lend impetus to that policy. The latter case teaches that such policy requires that courts avoid "niggardly construction of the statutory language." Our construction of Section 4 of the Clayton Act therefore must be consistent with the anti-trust policy as defined by the Congress and stated by the Supreme Court.

Stripped of its verbiage, defendants' arguments as we have fully stated them, would have us read into Section 4 of the Clayton Act that *only* persons who make direct purchases may be considered a "person * * * injured in his business or property" within the meaning of Section 4—or to put it in the converse—that no person who makes an indirect purchase shall be considered a "person" who may be "injured in his business or property" by reason of anything forbidden in the anti-trust laws.

Defendants' argument would also require us to read into Section 4 of the Clayton Act a proviso that would declare

as a matter of law that no person shall be considered to have been "injured in his business or property" within the meaning of the Act if he shall have "passed on" to some third party a substantial portion of any excessive charges forbidden by the anti-trust laws.

We are of the opinion that defendants' argument concerning the absence of any direct contractual relationship between plaintiffs and defendants is as untenable as the not dissimilar argument rejected by United States ex rel. Marcus v. Hess, 317 U.S. 537, 541, 63 S.Ct. 379, 87 L.Ed. 443 (1943).

Assuming, as we must, that for the purposes of this motion the allegations of plaintiffs' complaint are to be taken as true, we think Mr. Justice Black's realistic statement in Hess that "[t]he initial * * * action and every step thereafter taken, pressed to the ultimate goal—payment of government money to persons who had caused it to be defrauded" (317 U.S. at 543–544, 63 S.Ct. at 384) is broadly applicable to this case.

When attention is focused on the language of the statute and when the statute is read in light of the policy considerations we have mentioned, we do not believe that the answer to the question of whether a plaintiff must be in direct, as distinguished from indirect, relationship with defendants is difficult. We also believe that numerous other courts have so concluded.

Judge Learned Hand held in Vines v. General Outdoor Advertising Co., 2 Cir. 1948, 171 F.2d 487, 491, that under the language of Section 4 of the Clayton Act, which he quoted that "it has been repeatedly held that those are within this language who have been so injured *though they have no contract with the wrongdoer*" (171 F.2d at 491, emphasis ours).

Earlier, Judge Gardner of our controlling court held in Clark Oil Co. v. Phillips Petroleum Co., 8th Cir. 1945, 148 F.2d 580, cert. denied 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437 (1945), that "[u]nder the Clayton Act the right is not confined to persons in privity with the wrongdoer, but is given to anyone who has suffered injury to his business or property by reason of the wrongful acts" (148 F.2d at 582–583).

Both these cases were cited and followed by Judge James M. Carter in Karseal Corporation v. Richfield Oil Corporation, 9th Cir. 1955, 221 F.2d 358 at 363. As already noted, Judge Boldt was of the opinion in State of Washington that the fact that plaintiff "purchased the equipment through a third party rather than directly" did not deprive an anti-trust plaintiff of his right to sue as a person who had been injured in his business or property. The rationale implicit in the cases cited support our construction of Section 4 of the Clayton Act. We agree with and follow those cases.

We can not read into Section 4 of the Clayton Act a requirement of privity; nor do we believe that particular factual circumstances relating to whether or not illegal prices may or may not have been passed on is a relevant aid to be used in the construction and determination of the meaning of that statute. We speak, of course, only in regard to a plaintiff's right to sue; an entirely different question from the amount of damages a particular plaintiff may ultimately be entitled to recover.

Indeed, we deem it neither necessary nor appropriate to discuss in further detail defendants' "pass-on" theory, or to analyze the rationale of Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 7 Cir. 1964, 335 F.2d 203; Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 7 Cir. 1963, 315 F.2d 564, cert. denied Illinois v. Commonwealth Edison Co., 375 U.S. 834, 84 S.Ct. 64, 11 L.Ed.2d 64 (1963); Judge Feinberg's rejection of the passing-on argument in Ohio Valley Electric Corporation et al. v. General Electric Co. et al., S.D.N.Y., 244 F.Supp. 914, decided August 31, 1965; the Oil Jobber and other cases cited in those opinions; or the other numerous cases cited in the briefs of the parties.

We are convinced that so many words have already been devoted to "passing-on" that the real issue presented by de-

fendants' motion in this case has tended to be hidden by those verbal trees. As we view this branch of this case we are required only to determine what is meant by the uncomplicated language of Section 4 of the Clayton Act.

In that regard, we cannot say, without doing violence to the language of the statute and the policy considerations that underlie it, that plaintiffs, as a matter of law, are not persons whose business or property has been injured by something forbidden in the anti-trust laws. We therefore rule that plaintiffs may sue for damages as authorized by Section 4 of the Clayton Act for whatever injury they may be able to prove; and that, assuming such proof, they shall recover threefold the damages by them sustained, and the cost of suit, including a reasonable attorney's fee. We so hold.

## II. *Alleged Lack of Capacity of Defendants Other than Stupp Bros.*

Defendants dealt directly with plaintiffs on five particular projects. Defendants contend that a conspiracy between them with respect to those projects is inherently impossible because no defendant other than Stupp would have been able to perform any of those particular jobs because they lacked capacity and physical equipment, in steel available from the mills, and in financial resources to construct any of such projects.

It is not necessary to summarize the stipulated facts or to discuss the various affidavits filed by defendants and plaintiffs. It is sufficient to say that it is apparent that the basic facts upon which the defendants predicate this phase of their motion for summary judgment are disputed within the meaning of Rule 56 of the Rules of Civil Procedure, and that therefore it is apparent that the question presented is not in proper procedural posture for determination.

## III. *Defendants' Motion for Partial Summary Judgment Seeking to Dismiss Plaintiffs' Claims as to That Portion of Any Alleged Excessive Cost Reimbursed by the United States.*

Defendants' summation of the stipulated facts and plaintiffs' supplementary statement are appended as Appendix C and D, respectively.

Defendants suggest that "the question raised by the motion [for partial summary judgment] is whether the plaintiffs were actually injured in their business or property to the extent that the costs of the projects involved were reimbursed by the Federal Government under the provisions of Title 23, U.S.C." (p. 61 D.Br.).

On this branch of the case, defendants argue that "plaintiffs are suing for treble damages on the total amount that they allegedly 'paid' for fabricated structural steel despite the fact that the federal government paid anywhere from 50% to 90% of the total cost of the project involved" (p. 56 D.Br.). They argue further that "if there has been injury to 'business or property' by reason of any violation of the anti-trust laws, it is the business or property of the federal government to the extent that it reimbursed plaintiffs for the alleged excessive costs of fabricated structural steel used in each project, and not the 'business or property' of plaintiffs" (p. 57 of D.Br.).

Defendants would have us conclude that "because a person suing under Section 4 has no right to sue for any one other than himself, plaintiffs' claims in this case must be limited to their share of the cost of the structural steel which was the subject of the alleged conspiracy" (p. 61 D.Br.).

Upon motion, we granted the United States of America leave to file an amicus curiae brief on the limited issue of who are the real parties in interest. In that brief, the United States stated that:

It is the position of the United States that, notwithstanding the involvement of federal moneys, plaintiffs are the proper parties in this case to assert the claims for damages allegedly resulting from defendants' conspiracy. (p. 1 of Amicus Curiae Brief [3] of the United States)

---

3. Referred to hereinafter as A.C.Br.

Placing principal reliance upon Chattanooga Foundry & Pipe Works v. City of Atlanta, supra, the United States contended in its brief:

There can be no question that the ultimate purchaser of this steel was the State Highway Commission and not the United States Government, and that the State Highway Commission and not the United States let the contracts, paid its suppliers, and took title to the steel. Thus, there can be no doubt that the State agency incurred the alleged increased costs of the steel which resulted from the conspiracy. Presumptively, this establishes that the State Highway Commission (or the State of Missouri on its behalf) as the victim of the conspiracy was thereby 'injured in [its] business or property' with the alleged increased costs establishing the amount of damages incurred. (p. 2 A.C.Br.)

Because of our denial of the motion for partial summary judgment, we do not believe it necessary to outline further or discuss in detail the factual contentions, the supporting arguments, including suggested policy considerations, as contained in the *amicus curiae* brief of the United States.

We do, however, direct attention to the statement of the United States that it views the issue before the Court to be "whether a State is the proper party when the United States has made its own satisfactory arrangements with the State regarding any recovery obtained by the litigation" (p. 1 A.C.Br.). We shall return to this point later.

Plaintiffs point out that for purposes of partial summary judgment, defendants are not in a position to question that "plaintiffs are the real parties in interest entitled to some damages on all the projects involved" (p. 43 P.Br.). Plaintiffs therefore argue, and we think correctly so, that defendants' motion for partial summary judgment must necessarily deal with the question of the amount of plaintiffs' damage; not with the question of whether plaintiffs are entitled to *any* damages.

■ Familiar authority prohibits the utilization of Rule 56 of the Rules of Civil Procedure in the procedural situation here presented. Defendants' motion for partial summary judgment therefore should be and is therefore denied.

We believe, however, for the benefit of future proceedings in this case, we should indicate areas of agreement and disagreement with certain propositions of law that have been advanced by the parties.

■ In the first place, and quite fundamentally, we do not believe that an assumed violation of the anti-trust laws necessarily creates but a single and exclusive cause of action that must be said to be vested in any single person.

Section 4 of the Clayton Act provides that "[a]ny person who shall be injured in his business or property * * * may sue * * * and shall recover." As intimated by Judge Carter in Karseal Corp. v. Richfield Oil Corp., supra, we believe it possible, under particular factual situations, that several "persons" may have causes of action as a result of forbidden action taken by particular defendants in connection with a particular violation of anti-trust laws (see pages 364–365 of 221 F.2d).

Secondly, and consistent with the proposition just stated, we are of the opinion that we will probably be required at some later stage in this case, to review the precise terms of the arrangement between the United States and plaintiffs that we are now advised was made in connection with this litigation. We may be required to determine whether such arrangement is consistent with the Congressionally declared policy and proper administration of the anti-trust laws; certainly the terms of the arrangement wlil be relevant on the issue of damages.

It is not a new thing to take notice of the economic fact of life that an illegally inflated price may, in various ways, be carried along the chain of subsequent transactions.

Mr. Justice Holmes remarked almost fifty years ago in Darnell-Taenzer that "the effort to follow every transaction to its ultimate result [may involve] * * * endlessness and futility" because, said Mr. Justice Holmes, "[p]robably in the end the public pays the damages" (245 U.S. at page 534, 38 S.Ct. 186). That remark did not state an absolute or inevitable economic fact; it stated but one of many economic consequences that may vary from case to case.

We think it obvious that there will be cases where, because of the particular economic facts involved, an illegally inflated price might not reach the public because someone along the chain will have been forced to absorb the excess in order to stay in business. And we also think it is obvious that other particular cases, involving radically different economic factual situations, will establish ultimate facts that will fall somewhere between the polar factual situations just stated.

When the present case is tried, full attention will necessarily be directly focused on a problem that has not received a great deal of apparent attention; or, at least, has not been the subject of much articulate discussion in the books.

Plaintiffs' damages in this case, if this case progresses to that point, as distinguished from their right to sue as one of the persons whose business or property has been injured, must necessarily be presented in a manner that will reveal the ultimate economic consequences that follow plaintiffs' initial payment of the allegedly illegally inflated price. That evidence will undoubtedly reveal whether the arrangement between the United States and plaintiffs contemplates or permits readjustments or reimbursements that are directly tied to and directly related to the particular projects involved in this litigation, or whether the arrangement relates to some sort of an adjustment that looks to the future.

Specific inquiry into the terms of the existing arrangement between the United States and plaintiffs is presently premature because it is undisputed that plaintiffs were not reimbursed by the United States for all payments that were made on all the projects involved in this litigation.

As to all of the amounts that will be shown by the evidence to have been unreimbursed, there would seem to be no real question but that plaintiffs would be entitled to full and exclusive recovery.

As to whether recovery in excess of those unreimbursed amounts should be impressed with some sort of a constructive trust for the benefit of the United States, or whether other administrative procedures calculated to secure restitution to the United States may be utilized are open questions—questions, the answers to which may depend, at least in part, upon the terms of the existing arrangement between the United States and the State of Missouri or upon available administrative procedures applicable to the federal highway program.

We state the questions—and we emphasize that they are open questions—because not dissimilar questions have been presented and dealt with in the electrical anti-trust litigation that pended in this Court.

Some of the counsel in this case were counsel in the Kansas City Power & Light Company et al. v. Allis-Chalmers Manufacturing Co. et al., cases (Nos. 13608 to 13619, inclusive; 13623 to 13628, inclusive; 13700 to 13703, inclusive, W.D.Mo.). The order granting leave to dismiss those cases without prejudice as to some of the defendants, of which we take judicial notice, provided that, in accordance with applications made to and authorizations obtained from the respective regulatory commissions of the States of Missouri and Kansas, the net proceeds of the settlement of those plaintiffs' anti-trust causes of action in those cases would be applied to the reduction of the respective plaintiffs' plant accounts. The application of those net proceeds in such a manner, of course, will have the ultimate economic effect of plaintiffs' recovery inuring to the benefit of the members of the public who are presently and in the future will be those plaintiffs' customers.

The complexity of the stated open questions is reflected by the fact that when the general economic problem comes into play in a different perspective, the solution, of such a problem may produce an apparent, but in our opinion, not a real difference of judicial treatment. We refer, of course, to the question presented in Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 7th Cir. 1963, 315 F.2d 564. In that case the State of Illinois sought to intervene as a party "in order to represent and protect the interests of the public consumers of plaintiffs" (315 F.2d at 566). Intervention was denied by the Seventh Circuit Court of Appeals on the stated ground that "[t]he aftereffects of the hurt on the consumers are consequential and too remote for the consumers to gain rights against the conspirators."

A rule stated in terms of remoteness of damage may work well enough when the problem presented is whether additional parties plaintiff should or should not be added to an already complicated case. (The experienced trial Judge Robson quoted with approval experienced trial Judge Wyzanski's candid observation that "[a]dditional parties [and their predictable activity] tend to make the proceedings a Donnybrook Fair" (Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., D.C., 207 F.Supp. 252 at 257 and Crosby S. Gage & Valve Co. v. Manning, Maxwell & Moore, D.C., 51 F.Supp. 972 at 973)).

But that was not the problem under consideration when Chief Judge Becker of this Court made his order regulating the application of the net proceeds of the settlement of similar anti-trust litigation in this Court. Nor is it the problem that will be presented by the anticipated evidence in this case.

We have stated the questions and counsel are directed to consider (a) whether the question is a relevant one; and that, if relevant, (b) what each party, including the United States, thinks the answer or answers may be.

For the reasons stated, both motions of the defendants should be and are hereby denied.

It is so ordered.

## APPENDIX A
### (Pages 2–6 of Defendants' Brief)
#### STATEMENT OF FACTS

Plaintiffs assert they were injured in their business and property by reason of defendants' alleged conspiracy to rig bids and allocate territories in the sale of fabricated structural steel,[1] all in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2. There is no dispute that the structural steel with respect to which plaintiffs seek damages was purchased by independent prime contractors and subcontractors from defendants, and not by plaintiffs from defendants (¶ 5, Stip. No. 1). Plaintiffs had no dealings with defendants, with the exceptions noted in the motion. Plaintiffs let contracts to a prime contractor for the construction of a specified highway project. When that project required the construction of a new steel bridge, the prime contractor in turn let subcontracts for fabrication of the structural steel used in such bridges, or, in many instances, as pointed out more specifically below, the prime contractor let a subcontract for the furnishing and erection of the bridge complete to a bridge contractor, who, in turn, subcontracted with a fabricator for the furnishing of the structural steel (¶ 5, Stip. No. 1, Supplemental Affidavit of John P. Stupp and Affidavits of Oliver, Chesney, and Harrow attached hereto).

Contracts for entire highway projects were let after taking competitive bids from numerous prime contractors, and involved lump sum contract prices[2] for which the prime contractors agreed to

---

1. All references hereafter will be to "structural steel".

2. While it is true that the competition between the prime contractors was in the total bid on a project or combination of projects (the "lump sum") and plaintiffs awarded contracts for the projects in question only on the basis of such

furnish all equipment, materials and labor necessary to perform the work called for by the specifications. (See Exhibits B and C to Stipulation No. 1). The State Highway Commission of Missouri announced from time to time that on a certain date bids would be received on specified highway projects, some of which included the construction of new steel bridges. After having obtained plans and specifications on such projects from the State Highway Commission, interested prime contractors estimated the cost of labor and materials, overhead costs and the amount of expected profits to obtain the unit prices for each of the items required for a given highway project. These estimated unit prices were submitted to the State Highway Commission at the time of the letting and they were collected and published in the Tabulations of Bids Received. (Exhibits D through X to Stipulation No. 1). These Tabulations were secured from plaintiffs' own records. They show the bidding contractors on many of the projects here in dispute, and the spread between the bids of successful and unsuccessful bidders on the various items involved, including fabricated structural steel in place, the total price of the bridges on each project and the total price of the projects themselves.

The contractors' estimates as to the cost of various materials is shown in these Tabulations, but the estimated cost of structural steel there indicated (Item 17–B) is not the estimated cost of structural steel alone but is instead the estimated cost of structural steel *in place*, that is, erected, painted and otherwise integrated in the bridge which is in turn integrated in, and made a part of, the finished highway project. There is no claim that any of the defendants had anything to do with the erection of the

steel on the job. (¶ 8, p. 6, Stip. No. 1). The erection of the bridges and all other work and materials necessary to complete them and make them ready for use was done or furnished by someone other than defendants.[3]

When all unit price estimates had been inserted in a bid, as required by the Commission, the prime contractor was then required to "show the products of the respective unit prices and estimated quantities in the columns provided for that purpose, as well as the gross sum for which he would perform all of the estimated work as required by the general requirements and covenants, specifications and plans." (¶ 4d, Stip. No. 1). This gross sum was the prime contractor's bid on the entire project. The Commission awarded the contract for the entire project to the prime contractor who submitted the lowest bid on the entire project or combination of projects, even though he might not have submitted the lowest bid on each specific item or on each project on a combination of projects. Thus the competition between the prime contractors was in such total bids or lump sum contract prices (¶ 4d, g of Stip. No. 1).

After the prime contractor entered into a contract with the Commission he would execute a purchase agreement with suppliers, including structural steel fabricators, for the purchase of materials required for the project. In many cases he entered into subcontracts with subcontractors for the erection and completion of the bridge or bridges included on the project, and this subcontractor in turn subcontracted for furnishing of the fabricated structural steel. In the years 1954 through 1958 part of the fabricated structural steel sold by defendants for use in connection with construction of new steel bridges was sold by defendants

lump sum bids for the total project (see ¶4(d), (g), Stip No. 1), plaintiffs' standard specifications (Exs. B and C to Stip. No. 1) required the contractors to break down their total bid into unit prices for each of the separate items required to construct the project. See B–6, p. 8, Exs. B and C to Stip No. 1. The purpose

of this itemization is to provide a yardstick for payouts to the prime contractors as the work progresses and to provide a standard or formula by which the cost of extras and omissions might be figured.

3. With the exceptions mentioned in Paragraph 16 of Stipulation No. 1.

to subcontractors rather than prime contractors. In such cases the prime contractor let a subcontract to an erector for the construction of a bridge or bridges on the project and the erector subcontracted the fabrication of the structural steel to one of the defendants (¶ 9, Stip. No. 1).

Thus, during the calendar years 1954 through 1958 approximately 29% of the total sales by weight, and approximately 27% of the total sales in dollars, of all fabricated structural steel sold by defendant Stupp to be used in connection with the construction of new steel bridges for the State Highway Commission of Missouri (with the specific exceptions noted in footnote on page 1, supra) were sold by Stupp pursuant to quotations made by it as a sub-subcontractor to subcontractors and negotiations by it with such subcontractors (Supplemental Affidavit of John P. Stupp). In the entire period between January 1, 1954 and December 31, 1958, Missouri Valley furnished fabricated structural steel for use in the construction of 27 new steel bridges. On 17 occasions Missouri Valley sold the fabricated structural steel directly to the prime contractor who was erecting the bridge for plaintiffs; on the ten remaining occasions Missouri Valley sold the fabricated structural steel to subcontractors (Affidavit of J. V. Oliver, p. 2; see also Affidavits of Albert Svaglic, p. 4, and Robert B. Chesney, pp. 5–6, showing similar dealings by Havens and St. Joseph Structural Steel).

The prime contractors were independent, not affiliated or connected in any way with any of the defendants (¶ (A), Stip. No. 1). As independent contractors they made their own independent decisions as to the prices which they would bid for the projects in which they were interested. Depending upon competitive conditions, how badly they wanted a particular project, and the like, each decided himself how much, if anything, to include in his bid for profit, for overhead, for contingencies, and how he would allocate his overall bid price among the several items. The same would, of course, be true with respect to the bridge contractors who, as subcontractors, in many instances, purchased the fabricated structural steel from the fabricators, and erected the bridges for the prime contractors.

The bidding procedures used on the disputed projects are reviewed in the Missouri Supreme Court's opinion in State on Information of Eagleton v. Stupp Bros. Bridge & Iron Co., 380 S.W. 2d 382, 384. Both that Court's opinion and paragraphs 4(b), 15 and B of Stipulation No. 1 show that the figures prepared in advance of the lettings and used in the Tabulations of Bids Received were merely estimates and nothing more, and that frequently the prime contractors solicited and obtained lower prices for fabricated structural steel after their quotations for unit prices were submitted to the State. Such reductions did not result in lower total prices for the projects involved but resulted in added profits or reduced losses to the prime contractor or subcontractor as the case may be.

### APPENDIX B
(Pages 12–15a of Plaintiffs' Brief)

*Supplemental Statement of Facts*

To the extent that defendants have accurately paraphrased Stipulation No. 1, our only quarrel with them is over the facts which they have omitted. As to the affidavits which they have submitted, to a great extent we are in direct conflict and have submitted counter-affidavits which raise questions of fact. However, the real vice in defendants' statement is that their entire emphasis is on the role of the prime contractor. Defendants virtually ignore the part played by the structural steel fabricator.

We are satisfied that the Court will draw its own conclusion as to the relevant facts contained in Stipulation No. 1. However, we wish to call particular attention to the following facts contained in that stipulation:

(1) A prime contractor submitting a bid to the Highway Commission on any project which included a new

steel bridge was required to state the unit (per pound) price for fabricated steel in place (Par. 4c).

(2) To determine the unit price the prime contractor estimated the cost of labor (and in some instances, when required, the cost of painting), the overhead cost and the amount of profit which he expected to obtain for the steel erected in place. To this estimate he added the lowest acceptable quoted price per pound for structural steel received from a fabricator, plus sales tax and any transportation he might be required to furnish. The sum total of these items, adjusted as desired, was then inserted in his proposal to the Commission as the unit (per pound) price for steel in place (Par. (B), p. 10).

(3) In preparing a bid on a project which included the construction of a new steel bridge, the unit price for fabricated structural steel in place was one of the items which the prime contractor usually left open until he was satisfied that he had received final bids from all fabricators (Par. 4d).

(4) The great majority of prime contractors would go to Jefferson City the day before the time for submission of bids and would there receive quotations from structural steel fabricators during the day and night before the letting, and sometimes as late as within an hour or so before the actual submission of bids (Par. 4b).

(5) For the purpose of computing the bid which he submitted to the Commission, a prime contractor was not interested in the price which he had to pay for structural steel, as long as he was satisfied that he was being offered a price as low or lower than that offered any other prime contractor bidding on the project (Par. 4e).

(6) In advance of a letting structural steel fabricators interested in selling structural steel for use in connection with any project obtained from the Commission or from a prime contractor the plans and specifications prepared by the Commission (Par. 4f).

(7) Structural steel fabricators made it a practice to go to Jefferson City the day before the final date for submission of bids by prime contractors and there made oral quotations for structural steel which they were prepared to supply (Par. 4f).

(8) After obtaining a definite purchase order, a structural steel fabricator would prepare detailed shop drawings of the steel to be furnished and would submit them to the Chief Engineer of the Highway Commission for approval. Upon receiving approval, the fabricator would fabricate the steel at its plant and lay out the fabricated steel for the bridge or bridges ready for inspection. After the steel had been inspected and approved by an engineer for the Commission as complying with the plans and specifications, it would be disassembled and delivered to the designated point in parts and sections as provided by the plans and specifications prepared by the Highway Commission (Par. 6).

(9) The fabricator invoiced the prime contractor or subcontractor for the steel upon delivery. It was not normally the practice of the prime contractor or the subcontractor to pay the fabricator until payment had been received from the State (Par. 7).

Submitted herewith are the affidavits of Loren G. Hoffman, a certified public accountant employed by the State in this litigation, and J. N. Nichols, Shop Inspector for the Highway Commission. The affidavit of Mr. Hoffman contains the table and line chart appearing on the following page. The table and chart are designed to illustrate the relationship between the price at which a fabricator sells structural steel for new steel bridges constructed for the State of Missouri and the price which the State of Missouri must pay for that steel erected and in place. The affidavit of Mr. Nichols refutes defendants' contention that on the jobs which Stupp took as prime contractor only Stupp could fabricate the steel used in construction of those jobs.

STUPP BROS. BRIDGE AND IRON CO. KANSAS CITY STRUCTURAL STEEL. CO.

RELATIONSHIP OF COST OF MATERIAL IN PLACE PER EXHIBIT Y TO FABRICATORS SELLING PRICE OF STEEL IN CENTS PER POUND EXCLUDING BRIDGES WHERE STUPP WAS PRIME CONTRACTOR

| | 1954 | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|---|
| **Fabricators Weight** | | | | | |
| Stupp | 5,760,311 | 3,249,286 | 5,173,550 | 4,418,290 | 7,945,873 |
| K. C. Structural | 947,940 | 360,080 | 3,550,190 | 1,573,675 | 4,487,047 |
| Total | 6,708,251 | 3,609,366 | 8,723,740 | 5,991,965 | 12,432,920 |
| **Fabricators Selling Price** | | | | | |
| Stupp | $ 717,563 | $ 378,371 | $ 915,971 | $ 905,310 | $1,091,173 |
| K. C. Structural | 113,319 | 46,582 | 537,366 | 271,056 | 765,575 |
| Total | $ 830,882 | $ 424,953 | $1,453,337 | $1,176,366 | $1,856,748 |
| **Fabricators Selling Price per pound** | 12.39 | 11.77 | 16.66 | 19.63 | 14.93 |
| **State's Weight (structural steel only)** | | | | | |
| Stupp | 5,625,508 | 2,900,760 | 6,062,270 | 4,195,320 | 7,543,450 |
| K. C. Structural | 939,210 | 352,180 | 3,509,890 | 1,547,180 | 4,481,730 |
| Total | 6,564,718 | 3,252,940 | 9,572,160 | 5,742,500 | 12,025,180 |
| **State's Cost in Place** | | | | | |
| Stupp | $ 920,249 | $ 494,014 | $1,228,561 | $1,055,694 | $1,425,518 |
| K. C. Structural | 153,703 | 61,632 | 619,820 | 343,645 | 1,171,335 |
| Total | $1,073,952 | $ 555,646 | $1,848,381 | $1,399,339 | $2,596,853 |

Cost in Place

| per pound | 16.36 | 17.08 | 19.31 | 24.37 | 21.60 |
|---|---|---|---|---|---|

Total Number of Bridges

| | | | | | |
|---|---|---|---|---|---|
| Total Let to All Defendants | 70 | 51 | 56 | 42 | 75 |
| Total Let to Stupp and K. C. Structural | 41 | 33 | 36 | 22 | 47 |

STUPP BROS. BRIDGE AND IRON CO. AND KANSAS CITY STRUCTURAL STEEL CO. COMBINED

——— Cost of materials in place to State of Missouri

– – – Fabricators' selling price to contractor

Cents per pound

26 24 22 20 18 16 14 12 10

1954 1955 1956 1957 1958

## STUPP BROS. BRIDGE AND IRON CO.

### PARTICIPATION BY OTHER FABRICATORS ON BRIDGE JOBS
### WHERE STUPP BROS. WAS PRIME CONTRACTOR

| Stupp Order No. | Other Fabricators | Payments to Other Fabricators | | Stupp Sale to State of Missouri | |
|---|---|---|---|---|---|
| | | Pounds | Amount | Pounds | Amount* |
| **St. Charles Bridge:** | | | | | |
| Project No. IN-891(5)c: | | | | | |
| 14333 | | – | $ – | 1,800,100 | $ 366,470 |
| 14334 | Bethlehem Steel | 6,027,441 | 984,852 | 6,098,930 | 1,563,727 |
| | | 6,027,441 | $984,852 | 7,899,030 | $1,930,197 |
| Project No. IN-891(5)d: | | | | | |
| 14335 | – | – | $ – | 7,548,300 | $2,057,207 |
| **Mark Twain Bridge:** | | | | | |
| Project No. I-892(17): | | | | | |
| 14590 | Mississippi Valley | 4,654,686 | $913,227 | 11,695,390 | $3,269,573 |
| **Boone-Cooper Bridge:** | | | | | |
| Project No. I-229(16)b: | | | | | |
| 14655A | American Bridge | – | $ – | 1,718,045 | $ 558,292 |
| 14655B | | 2,458,350 | 630,048 | 2,505,085 | 812,963 |
| 19655C | | – | | 1,008,140 | 327,631 |
| | | 2,458,350 | $630,048 | 5,231,270 | $1,698,886 |
| Project No. I-229(16)c: | | | | | |
| 14656 | – | – | $ – | 6,798,280 | $2,357,907 |

* Includes sales tax

APPENDIX C
(Pages 52–56 of Defendants' Brief)

## STATEMENT OF FACTS

The extent of the federal government's financial participation in all the highway projects where defendants' structural steel was used is undisputed. This statement will demonstrate that federal involvement in State highway projects in this case went far beyond the contribution of dollars and cents and pervaded plaintiffs' highway programs and specific projects from their inception, during their construction, and continued even during their subsequent use.

A Federal-Aid project [1] begins when Congress authorizes federal funds for highway construction. Federal funds, apportioned by Congress among the states six to twelve months before the beginning of each fiscal year according to statutory formulas, are available for that fiscal year and for two years thereafter. Within this three year period the funds apportioned to any state, including Missouri, must be committed to specific construction work. Any federal funds not committed within the three year limit lapsed.

After being advised of the amount of federal aid available to it in each fiscal year, each state draws up programs of projects to be built with these funds. At this stage the Bureau of Public Roads and the states settle questions as to selection of specific projects and their location, design and cost. Bureau of Public Roads, The Administration of Federal Aid for Highways, p. 9 (1957). These programs of proposed projects must be submitted to the Federal Highway Administrator [2] (hereafter "the Administrator") on such forms and supported by such information as he may require. No state is authorized to proceed with any project until the program which includes the project has been approved.

Program approval is directed toward construction of new Federal-Aid highways. The Federal-Aid program has, however, a direct impact on existing state highways. No state highway may become part of a Federal-Aid highway system and therefore eligible for Federal-Aid apportionments to be expended thereon until approved by the Administrator. 23 C.F.R. § 1.6. The Administrator is required to select or designate highways as part of the Federal-Aid system so as to promote "the general welfare and the national and civil defense and to become a pattern for a long-range program of highway development to serve the major classes of highway traffic broadly defined as (1) interstate or interregional; (2) city-to-city primary, either interstate or intrastate; (3) rural secondary or farm-to-market; and (4) intraurban. The conservation and development of natural resources, the advancement of economic and social values, and the promotion of desirable land utilization as well as the existing and potential highway traffic and other pertinent criteria are to be considered when selecting highways to be added to a Federal-Aid system or when proposing revisions of a previously approved Federal-Aid system." 23 C.F.R. § 1.6(c).

The selection considerations reiterate and expand the policies recited by Congress in Title 23. 23 U.S.C. § 101(b):

"It is hereby declared to be in the national interest to accelerate the construction of the Federal-aid highway systems, including the National System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs

---

1. All the steel involved in this lawsuit was used in bridges on Federal-Aid projects with the exception of ten bridges included on project Nos. Secs. 111(2), 58(1) 2, 85(1), 107(1)2, 57(1), 25(1), 107(1) and U95(2). See pages 8, 9, 14 and 15 of Exhibit 1 to Stipulation No. 2.

2. The Secretary of Commerce has delegated his statutory powers to administer the Federal-Aid program to the Federal Highway Administrator and the Bureau of Public Roads, 23 C.F.R. § 1.22 (1957).

of local and interstate commerce, for the national and civil defense."

In approving programs for new roads or additions to old roads the Administrator must observe similar priorities. 23 U.S.C. § 105(a). National rather than local needs are the primary statutory guides. The Administrator must give preference to programs which expedite completion of the interstate system. 23 U.S.C. § 105(a). He must give priority to projects recommended by the Secretary of Defense as important to the national defense. 23 U.S.C. § 105(d).

After the programs have been accepted by the Administrator the state then proceeds to make detailed surveys for each project and to prepare plans, specifications and final cost estimates (hereafter "PS&E"). The PS&E must be prepared by or under the immediate direction of the State Highway Department and they must be of such content and form as the Administrator prescribes. 23 C.F.R. § 1.10. No project or any part of it can be advertised for a contract nor work commenced until the PS&E have been submitted to and approved by him. The PS&E must meet minimum statutory requirements. Thus, no state may add points of access to, or exit from, any interstate route except upon the prior approval of the Secretary of Commerce or his delegate. See 23 U.S.C. § 111. The plans submitted for a project must meet federal standards in such matters as traffic needs, geometric and construction standards, safety standards, and vehicle weight and width limitations. 23 U.S.C. §§ 109, 127. The Administrator's approval of the surveys, plans, specifications and estimates is and was "deemed a contractual obligation of the Federal Government for the payment of its proportional contribution" to such project. 23 U.S.C. § 106(a).

Following such approval the state then advertises for bids. The award of a contract for construction of a particular project must be authorized by the Administrator. The Administrator must approve the state's method of letting contracts. 23 U.S.C. § 112(a). He insures that the prevailing wage rates are paid to all laborers and mechanics employed on a project; he controls the use of convict labor (23 U.S.C. §§ 113(a), 114(b)). The statute also authorizes the Administrator to secure land for the state when the state is otherwise unable to secure it. 23 U.S.C. § 107. Finally, the Administrator must inspect and approve all construction. 23 U.S.C. § 114. See generally 23 C.F.R. §§ 1.15–1.24 setting out in great detail the requirements which any contractor must meet before commencing work on a Federal-Aid highway project.

Even after the construction itself is complete the statute requires that the State Highway Department maintain the Federal-Aid highway projects in accordance with policies and procedures approved by the Administrator. 23 U.S.C. § 116.[3] Additionally, the State Highway Department must keep for three years records and documents such as are needed to inform the Administrator of how federal funds were used on particular projects. 23 C.F.R. § 1.30.

As soon as practicable after plans, specifications and estimates for a specific project have been approved, the Federal Highway Administrator enters into a formal project agreement with the Missouri State Highway Department concerning the construction and maintenance of the project and fixing the responsibility of the Missouri State Highway Department and the Federal Government for their respective share of the cost of the project. 23 U.S.C. § 110. Exhibit A to Stipulation No. 2 is a typical project agreement.

As the work on a particular project progresses the state periodically pays the prime contractor and claims reimbursement from the Bureau of Public Roads for the allowable federal share of the

---

3. "The responsibility imposed upon the State Highway Department, pursuant to 23 U.S.C. 116, for the maintenance of projects shall be carried out in accordance with policies and procedures issued by the Administrator * * *" 23 C.F.R. § 1.27.

cost. The statute expressly authorizes the Federal Highway Administrator to make progress payments. 23 U.S.C. § 121(a).[4] When the project has been completed, inspected and accepted by the Administrator a final detailed accounting of cost is made by the state and reviewed by auditors for the Bureau of Public Roads.

### APPENDIX D
(Pages 39–42 of Plaintiffs' Brief)

*Supplemental Statement of Facts*

The parties have stipulated, for the purpose of this motion, that the facts contained in the exhibit filed in this Court on March 17, 1965, and the further facts contained in paragraph 2 of Stipulation No. 2 are true. In addition to those facts, defendants argue the extent of the supervision and regulation exercised by the Federal Bureau of Public Roads pursuant to the requirements of Title 23 of the U.S. Code over highway projects on which Federal funds are used. The fallacy of defendants' argument is that many of the sections of Title 23 on which defendants rely in their brief (pp. 54–56) have no application here because they were not enacted into law until the enactment of the Federal-Aid Highway Act of 1958 (72 Stat. 894).[9] In view of the applicable law discussed infra, the matter is not of sufficient significance to warrant detailed analysis. However, to illustrate our point, we invite the Court's attention to the Federal-Aid Highway Act of 1944 (58 Stat. 838), the Federal-Aid Highway Act of 1948 (62 Stat. 1105), the Federal-Aid Highway Act of 1950 (64 Stat. 785), the Federal-Aid Highway Act of 1954 (68 Stat. 70) and the Federal-Aid Highway Act of 1956 (70 Stat. 374).

One very significant fact which defendants have omitted is the manner in which grants in aid of highway construction are made to the states, apportioned among the states and made available for state use. Section 4 of the Federal-Aid Highway Act of 1944 (58 Stat. 840) provides:

"Sec. 4. After making the deductions for administration, research, and investigations as provided in section 21 of the Federal Highway Act of 1921, the sums authorized shall be apportioned as follows:

(a) The $225,000,000 per year available for projects on the Federal-aid highway system shall be apportioned among the States as provided in section 21 of the Federal Highway Act.

(b) The $150,000,000 per year available for projects on the secondary and feeder roads shall be apportioned among the States in the following manner: One-third in the ratio which the area of each State bears to the total area of all the States; one-third in the ratio which the rural population of each State bears to the total rural population of all the States, as shown by the Federal census of 1940; and one-third in the ratio which the mileage of rural delivery and star routes in each State bears to the total mileage of rural delivery and star routes in all the States: *Provided,* That no State shall receive less than one-half of one per centum of each year's allotment under subsection (a) and this subsection.

(c) The $125,000,000 per year available for projects on highways in urban areas shall be apportioned among the States in the ratio which the population in municipalities and other urban places, of five thousand or more, in each State bears to the

---

4. In those cases where a state finds it difficult to pay the contractors and then wait for reimbursement from the federal government, the law permits the Administrator to advance money to these states to be used as a revolving fund.

9. This matter has been the subject of several discussions with defense counsel and was brought up at one pre-trial conference. It is difficult to understand why defendants persist in relying on statutory provisions which did not exist and have no application to the construction of bridges involved in this lawsuit.

188

total population in municipalities and other urban places, of five thousand or more, in all the States as shown by the latest available Federal census: *Provided,* that Connecticut and Vermont towns shall be considered municipalities regardless of their incorporated status.

(d) Any sums apportioned to any State under the provisions of this section shall be available for expenditure in that State for one year after the close of the fiscal year for which such sums are authorized, and any amount so apportioned remaining unexpended at the end of such period shall lapse: *Provided,* That such funds shall be deemed to have been expended if covered by formal agreement with the Commissioner of Public Roads for the improvement of a specific project as provided by this Act."

The foregoing provisions were carried forward, with one notable exception, into the statutes applicable to federal grants during the period January 1, 1954 to January 1, 1959. (See Section 1 of Federal-Aid Highway Act of 1950, 64 Stat. 785; Section 1 of Federal-Aid Highway Act of 1954, 68 Stat. 70; and Section 102 of Federal-Aid Highway Act of 1956, 70 Stat. 374). The exception is that the Federal-Air Highway Acts of 1950, 1954 and 1956 all provide that any sums apportioned to any state shall be available for expenditure in that state for *two* fiscal years after the close of the fiscal year for which the sums are authorized.

In each of the foregoing Acts there is a provision that on any particular project a proportionate share of the cost must be borne by the State in order to obtain reimbursement from its Federal grant for a portion of the cost of that project.

It should be noted that a state is perfectly free to contract for the construction of as many highway projects as it desires. On as many of those projects as qualify with respect to being part of, and meeting the standards required for, a particular system for which Federal funds have been granted to that state to aid it in the construction of such projects, the state is entitled to partial reimbursement out of the funds granted to it. Each annual grant may be used not only during the fiscal year for which the grant is made, but for two fiscal years thereafter. It is apparent that the number of projects on which a state may receive Federal aid is limited, not by the terms of the Federal grant, but by the amount which the state is forced to pay for those projects. When the Federal grant is exhausted, additional projects must be paid for entirely out of state funds.