The STATE OF MINNESOTA, The State of North Dakota, State of South Dakota, et al., State of Wisconsin, City of St. Paul, Independent School District #625 of the City of St. Paul, Minnesota, and Housing and Redevelopment Authority of the City of St. Paul, Minnesota, Plaintiffs,

v.

UNITED STATES STEEL CORPORA-TION, Paper, Calmenson & Co., St. Paul Foundry & Manufacturing Co. (now The Maxson Corporation), St. Paul Structural Steel Company, Crown Iron Works Company, The Hustad Company, Defendants.

Nos. 4–68 Civ. 37, 4–68 Civ. 36, 4–68 Civ. 38, 4–68 Civ. 41, 3–68 Civ. 34, 3–68 Civ. 37, 3–68 Civ. 39.

United States District Court
D. Minnesota,
Third and Fourth Divisions.
May 15, 1969.

---

Erickson, Popham, Haik & Schnobrich, by Bruce D. Willis, Minneapolis, Minn., Roger E. Montgomery, Special Asst. Atty. Gen., and Eric Miller, St. Paul, Minn., for plaintiff State of Minnesota.

Erickson, Popham, Haik & Schnobrich, by Bruce D. Willis, Minneapolis, Minn., Paul M. Sand, First Asst. Atty. Gen., Bismarck, N. D., and Robert A. Alphson, Special Asst. Atty. Gen., Grand Forks, N. D., for plaintiff State of North Dakota.

Erickson, Popham, Haik & Schnobrich, by Bruce D. Willis, Minneapolis, Minn., and David Gienapp, Pierre, S. D., for plaintiff State of South Dakota, and others.

George F. Sieker and Theodore L. Priebe, Asst. Attys. Gen., Madison, Wis., for plaintiff State of Wisconsin.

O'Connor, Green, Thomas, Walters & Kelly, by H. Robert Halper, Washington, D. C., for plaintiffs City of St. Paul, Independent School District #625 of the City of St. Paul, Minnesota, Housing and Redevelopment Authority of the City of St. Paul, Minnesota, The Housing and Redevelopment Authority in and for the City of Minneapolis, Minnesota; Lester E. McAuliffe, Asst. Staff Counsel, City of St. Paul, also appeared for the Housing and Redevelopment Authority of the City of St. Paul; Kenneth J. Fitz-patrick, Asst. Corp. Counsel, also appeared for the City of St. Paul.

Briggs & Morgan, by David W. Raudenbush, John R. Friedman, St. Paul, Minn., and D. B. King, Pittsburgh, Pa., for defendant United States Steel Corp.

Doherty, Rumble & Butler, by Frank Claybourne and Eugene M. Warlich, St. Paul, Minn., for defendant Paper, Calmenson & Co.

Moore, Costello & Hart, by Robert A. Albrecht, St. Paul, Minn., appeared for defendant St. Paul Foundry & Manufacturing (now The Maxson Corporation).

Fredrikson, Byron & Colborn, by Jerome B. Pederson, Minneapolis, Minn., for defendant St. Paul Structural Steel Co.

Oscar A. Brecke and J. Robert Nygren, Minneapolis, Minn., for defendant Crown Iron Works.

Warner, Ratelle, Hennessy, Vander-Vort & Stasel, by Frank J. Warner, Minneapolis, Minn., for defendant The Hustad Co.

NEVILLE, District Judge.

These private antitrust actions are brought by four States and (originally) four other governmental agencies for treble damages under the Sherman and Clayton Acts against six structural steel fabricating companies. The complaint alleges that the six defendants conspired to fix prices within the States of Minnesota, Wisconsin, North Dakota and South Dakota in the structural steel fabricating industry and that the defendants allocated contracts and business among themselves. It is alleged generally that the defendants sold structural steel at unduly inflated and non-competitive prices to the plaintiffs, to governmental subdivisions of the four State plaintiffs and to various contractors who used structural steel on construction projects paid for by the various plaintiffs and claimants herein. Involved are some five to six thousand business transactions by the defendants between the years 1949 and 1964 or thereabouts.

The suits are the aftermath of a criminal action brought by the United States on February 10, 1964 in which each of the defendants subsequently entered *nolo contendere* pleas.

Eight actions originally were commenced, most seeking to maintain a suit as a class action under Rule 23 of the Federal Rules of Civil Procedure.[1] In State of Minnesota v. United States Steel Corp., 44 F.R.D. 559 (D.Minn. 1968), this court entered an order permitting the States and State agencies named therein to maintain their actions as class actions. The court also consolidated the various actions for purposes of pretrial matters, discovery, motions, and ultimately for trial. Since then numerous pretrial conferences have been held. The court has set a timetable for discovery and has ruled upon several objections to interrogatories.

The matter presently for decision relates to Interrogatory 6 of Defendants' Interrogatories to Plaintiffs—Set No. 1. Interrogatory 6 asks whether some other governmental entity paid claimants in whole or in part for the construction projects involved in these actions and inquires thereafter into the relationship between claimants and such entity, including the amount of payments and the documents relating thereto.[2] Essentially defendants seek to know the amount of funds made available by grants-in-aid or loans from the United States to the States or other claimants for some portions of the various construction projects in which structural steel was used. The interrogatory would appear broad enough to include information as to the amount of money made available by the various States to their subdivisions who are claimants as members of a class.[3] For purposes of this motion, discussion can be limited principally to Federal grants and funds, however.

Both sides concede that some Federal monies were made available to plaintiffs and claimants or some of them for highway construction, for public housing purposes, for construction of school or health care facilities, and for other construction projects. During the time period in question, some if not all of the States also made funds available to their

1. At a pretrial conference on April 9, 1969 on motion and by stipulation of counsel, the case brought by the Housing and Redevelopment Authority of the City of Minneapolis, Minnesota as a party plaintiff was dismissed.

2. Interrogatory 6 asks plaintiffs:
"Whether any governmental or other entity other than the claimant paid the claimant or the agency or department of the claimant which awarded the purchase contract in whole or in part for the construction of said project or structure or any part thereof, and if so:
(a) The identification of such governmental or other entity.
(b) The date of the commitment by such governmental or other entity to the claimant or the agency or department of the claimant to make such payment.
(c) The amount and date of each payment and the total amount of such payments. If this information is not presently available, then the basis for computing the total amount paid.
(d) Whether such commitment covered less than the entire project or struc-

ture, and if so, the description of that part of the project or structure covered thereby.
(e) The identification of each document relating to any such commitment or payments."

3. Defendants state it is possible that both a State plaintiff and a County or school district or other claimant as a member of the class represented by the State are asserting duplicate claims for the same project. The court by its ruling herein does not limit the right of defendants to discover whether this be the case and, if so, what claims are being duplicated. Defendants may submit appropriate interrogatories to this end or pursue other means of discovery in order to ascertain the existence or non-existence of any duplicate claims and the amount thereof. The "passing-on" defense as between a State and one of its subdivisions would seem to be of no import to defendants since one is a plaintiff and the other is a claimant as a class member and (so long as there be no duplication) whoever recovers, if recovery be had, can make no real difference to defendants.

governmental subdivisions for similar purposes.

It is the position of defendants that Interrogatory 6 is reasonably calculated to lead to the discovery of admissible evidence. Defendants desire to discover the extent to which the various claimants were reimbursed in whole or in part for project construction costs. Defendants contend that any damages ultimately recovered by plaintiffs must be proportionately reduced according to the amount of money reimbursed or paid to plaintiffs by the United States.[4] The real issue for resolution is whether defendants may assert the so-called "passing-on" defense or something analogous thereto perhaps called the "reimbursement defense" in mitigation of damages.[5]

The plaintiffs state that Interrogatory 6 is irrelevant in that the facts sought by such interrogatory would not as a matter of law lead to the discovery of evidence relevant to this action. Plaintiffs state that the issue before the court is essentially a question of standing; that is, where should the court draw the line as to who is the proper party and thus has standing to sue in a situation such as presents itself in the case at bar. Excellent briefs have been filed on behalf of both sides and the court has heard oral argument on the subject.

For purposes of this motion only, the court necessarily must assume that the activities of defendants resulted in overcharges to defendants' customers, claimants herein, for structural steel and that claimants paid for some portion of the construction projects in which such structural steel was used with funds made available by grants-in-aid and loans from the United States or from one of the States.

The import of Interrogatory 6 is not necessarily to discover the infinite variety of the various Federal or State grants-in-aid or loan programs that are made available by the United States or a State for the benefit of state, county and municipal bodies. The interrogatory focuses rather on a specific dollar amount, i. e., the amount of reimbursement funds received. Defendants' purpose obviously is to limit the ultimate recovery by claimants, if any there be. The court believes that it is presented with a question of law and that resolution thereof is proper at this time.[6] The legal issue involved is whether the dollar amount of reimbursement by the Federal or State government ultimately may be introduced into evidence so as to diminish any recovery on the part of plaintiffs or claimants. This legal issue cannot vary whether the answers to Interrogatory 6 show that the amount of

4. Defendants take the position that Interrogatory 6 deals solely with the question of damages. The court by previous order has limited discovery at this time to the question of conspiracy of other antitrust violations. No substantial discovery as to damages has been undertaken. The court therefore could sustain plaintiffs' objections to Interrogatory 6 on the ground that since it deals with damages, it is premature. The court recognizes, however, that this would only postpone a very important issue in the case and leave the parties in a state of uncertainty. Moreover, the time for more extended discovery is approaching and plaintiffs have stated that if they must answer Interrogatory 6, they would like to be so informed as soon as possible.

5. The typical "pass-on" situation results when a plaintiff is able to pass on illegal overcharges made to it to its customers in the form of increased prices. This case presents a different situation. Here the plaintiffs are not passing on any overcharges. Instead, the "overcharges" (assuming same for purposes of this motion) have been passed on to claimants by the various contractors involved on the jobsite and plaintiffs in turn have been *reimbursed* in whole or in part by the United States Government or by one of the States.

6. Neither party has argued that the answers would disclose pertinent facts which might alter the ultimate outcome of the lawsuit. Neither side has argued that it would make any difference were the funds a loan rather than a grant-in-aid. It is not argued that the identity of the particular federal agency involved is in any way relevant.

reimbursement was 50% or 90% or some other percent of the total construction project costs, nor whether the payment was a grant or a loan. If defendants are not able to assert a "passing-on" or "reimbursement" defense in such a situation as is before the court as a matter of law, then the specific amounts of any payments made to the claimants herein or the conditions under which made by the Federal government or from which agency are immaterial. This is already a lengthy and complex case. The court feels that it is important in a case such as this to exercise some check on the scope of discovery so as to prevent the needless introduction of endless collateral matters.[7] From a practical standpoint, a decision now may well materially hasten the ultimate disposition of this lawsuit.

■ The Clayton Act allows private antitrust actions to be brought for treble damages. The purpose of this section is both to compensate victims of illegal conduct and to aid the public enforcement of the antitrust laws. In Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 318, 85 S.Ct. 1473, 1477, 14 L.Ed.2d 405 (1965) the Supreme Court declared that "private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws." See also, United States v. Borden Co., 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954). The enforcement factor adds important policy considerations which cannot be overlooked. Thus it has been observed that:

> "[t]he essential purpose of the trebling provision is to deter antitrust violations. It is agreed that Congress meant the prospect of awards of treble damages and attorney's fees to induce private parties to bring costly and uncertain antitrust litigation, thus enlisting the business public as a supplementary enforcement body dealing with violations against which the Government, with its limited enforcement resources, fails to proceed. In addition, the heavy recovery was meant to deter violations by augmenting the relatively light equitable and criminal remedies available to the Government." [8]

■■ In a private antitrust suit, a plaintiff has three hurdles to overcome. First, the plaintiff must prove that the defendant or defendants committed a violation of law; second, that plaintiff has been injured, i. e., the fact of damage; and third, the amount of damage

---

**7.** It is noted that Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) and Atlantic City Electric Co. v. General Electric Co., 226 F.Supp. 59 (S.D.N.Y.) interlocutory appeal refused, 337 F.2d 844 (2d Cir. 1964) arose on objections to interrogatories. In the *Atlantic City Electrical* case, the Second Circuit specifically rejected the argument that sustaining objections to various interrogatories relating to the passing-on defense would create undue prejudice or substantially upset the conduct of the lawsuit. The Second Circuit said:

> "If pre-trial discovery were allowed as defendants request it could easily develop into a multitude of full scale rate cases which could dwarf in time and testimony the already extensive pre-trial proceedings. If the district court is in error, as to which no opinion is expressed, defendants will have full opportunity in the event of an adverse judg-

ment, if based in whole or in part upon this error, to have it corrected upon appeal together with any other errors which may be urged. It is doubtful that any discoveries or hearings required to establish the extent of any damages, if the passing-on doctrine applies, would be more burdensome then than now. * * *" 337 F.2d at 845.

**8.** Note, Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business, 80 Harv. L.Rev. 1566, 1566–67 (1967) (footnotes omitted in quotation). This Note stated:

> "[T]he validity of the passing on defense would be largely unquestioned today if the private antitrust suit were exclusively compensatory. * * *
>
> The fact that the passing on defense is now quite generally disallowed in private antitrust cases seems due to the enforcement purposes of the suit." 80 Harv.L.Rev. at 1584–85.

plaintiff has suffered. These hurdles, however, are subject to different burdens of proof and once a plaintiff has proven the "fact of damage," uncertainty as to the amount of damage will not bar recovery.[9] It is this "fact of damage" which gives a private litigant standing to sue for treble damages.[10] In private antitrust cases the standing requirement goes to the very substance of plaintiff's claim.

> "Instead of being merely a collection of technical rules and doctrines, 'standing' is basically the device by which a court determines whether the harm alleged by the plaintiff is of the type which is—or ought to be—entitled to judicial protection. After all, the chain of causation extends indefinitely from a given act; and once that chain is traced, the real problem is determining the point where the chain should be cut off—where the line should be drawn—in imposing liability." [11]

The real issue in the case at bar, in the court's opinion, is whether the State governmental entities, as plaintiffs and other claimant members of the class have standing to seek full recovery from defendants notwithstanding the fact that partial reimbursement for various construction projects was made by the Federal or State Government. When antitrust violations result in a series of chain reactions causing injury to many various interests and groups, both business and governmental, it is the task of the judiciary when suits are brought for such violations to determine who are the appropriate parties to sue for damages. Many factors enter into this decision [12] and the resolution of this question requires a practical, not theoretical, approach. In this respect, courts have mentioned the drastic nature of the treble damage action,[13] the problem of allowing a windfall to those plaintiffs injured only indirectly,[14] the avoidance of multiple liability and litigation,[15] and the danger of unduly burdening a particular industry by allowing private suits by those having only a remote interest.[16] The question is where to alight so as to effectuate both the compensation and

---

9. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). *See also* Atlas Bldg. Prods. Co. v. Diamond Block & Gravel Co. 269 F.2d 950, 958 (10th Cir. 1959), cert. denied, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960) for a discussion of the distinction between the "fact of damage" and the "amount of damage."

10. E. Pollock, Standing to Sue, Remoteness of Injury, and the Passing-On Doctrine, 32 A.B.A. Antitrust L.J. 5, 6 (1966); Antitrust Developments, 1955–1968 at 300 (1968).

11. E. Pollock, *supra* note 10, at 9.

12. *See generally*, E. Pollock, *supra* note 10, at 9–10.

13. Image and Sound Ser. Corp. v. Altec Serv. Corp., 148 F.Supp. 237, 239 (D. Mass.1956) (plaintiff corporation having made no contracts for territorial franchises for installation and servicing of sound equipment not engaged in "business" within meaning of Section 1.) See also Westor Theatres, Inc. v. Warner Bros. Pictures, Inc., 41 F.Supp. 757, 762 (D.N.J.1941).

14. Snow-Crest Beverages, Inc. v. Recipe Foods, Inc., 147 F.Supp. 907, 909 (D. Mass.1956) (recovery denied manufacturer of ingredient used in beverage syrup against competitor of bottler of syrup for alleged antitrust violations in sale of syrup even though manufacturers and bottler had identity of ownership.) See also Conference of Studio Unions v. Loew's, Inc., 193 F.2d 51, 55 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

15. Loeb v. Eastman Kodak Co., 183 F. 704, 709 (3rd Cir. 1910) (recovery denied to a stockholder creditor of a corporation forced into bankruptcy by defendant's antitrust violations); see also Ames v. American Tel. & Tel. Co., 166 F. 820, 823 (D.Mass.1909).

16. Harrison v. Paramount Pictures, Inc., 115 F.Supp. 312, 317 (E.D.Pa.1953), aff'd, 211 F.2d 405 (3rd Cir.) cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954) (recovery denied landlord on percentage rental for alleged antitrust violations between tenant-operator and motion picture distributor). But see fn. 19 below.

enforcement purposes of Section 4 of the Clayton Act.

█ Many parties may be hurt as a result of antitrust violations, but not every party asserting an adverse effect from defendants' alleged violation of the antitrust laws has standing to sue. Thus courts have denied the derivative claims of a stockholder-creditor of a corporation forced into bankruptcy by the defendant's antitrust violations,[17] of a partner in an injured business partnership,[18] of a landlord of an injured lessee,[19] of a supplier of an injured customer,[20] of a patent owner claiming royalty losses attributable to injuries to his licensee,[21] of an insurance agent representing an injured underwriter,[22] of members of an injured association,[23] and of a franchisor of injured franchisees.[24]

The law in this area perhaps is presently in a state of flux. For example, while it has been held that officers and employees of an injured corporation have no standing to sue under Section 4 of the Clayton Act for injuries to the corporation,[25] recent decisions have allowed officers and employees to bring Section 4 suits for injuries due to loss of employment from antitrust violations committed against the corporation.[26] The modern authorities seem to have developed the "target area" theory.[27] Under this approach a private litigant has standing to sue if he "was within the target area of the illegal practices," and "was not only hit, but was aimed at." Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 365 (9th Cir. 1955).[28] The Eighth Circuit in Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679 (8th Cir. 1966)[29] has approved of the "target area" approach as expressed in *Karseal* and has rejected any narrow interpretation of standing under Section 4 of the Clayton Act.

In the present case there can be no question but that the various claimants herein were within the target area of the alleged conspiracy and were not only

17. Loeb v. Eastman Kodak Co., *supra* note 15.

18. Coast v. Hunt Oil Co., 195 F.2d 870 (5th Cir. 1952). *But see*, Klebanow v. New York Produce Exchange, 344 F.2d 294 (2nd Cir. 1965).

19. Lieberthal v. North Country Lanes, Inc., 221 F.Supp. 685 (S.D.N.Y.1963); Erone Corp. v. Skouras Theatres Corp., 166 F. Supp. 621 (S.D.N.Y.1957); however, where the tenant was a participant in the illegal activity, and landlord has been granted standing to sue. Congress Bldg. Corp. v. Loew's, Inc., 246 F.2d 587 (7th Cir. 1957).

20. Volasco Prods. Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963).

21. Productive Inventions, Inc. v. Trico Prods. Corp., 244 F.2d 678 (2nd Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956).

22. Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299 (D.Mass.) aff'd, 242 F.2d 758 (1st Cir.), cert. denied, 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41 (1957).

23. Schwartz v. Broadcasting Music Inc., 180 F.Supp. 322 (S.D.N.Y.1959).

24. Nationwide Auto Appraiser Service, Inc. v. Association of Casualty & Surety Cos., 382 F.2d 925 (10th Cir. 1967).

25. *See, e. g.*, Mortens v. Barrett, 245 F.2d 844 (5th Cir. 1957).

26. *See, e. g.*, Dailey v. Quality School Plan, Inc., 380 F.2d 484 (5th Cir. 1967); Nichols v. Spencer International Press, Inc., 371 F.2d 332 (7th Cir. 1967); and Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386 (S.D.N.Y.1967).

27. *See* E. Pollock, *supra* note 10, at 17–19.

28. *See also* E. Pollock, *supra* note 10, at 19, where the author observes that the target area theory is satisfied "if the plaintiff falls in the category of *reasons* toward whom the violation was generally directed and if the harm was of the type which the particular prohibition was designed to prevent or limit."

29. The court said:
"We regard *Kasseal* and the *South Carolina* case as sound in their approach and application and as a persuasive precedent here." 368 F.2d at 688–689. The *South Carolina* case is South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir. 1968).

"hit" but were "aimed at." It is undisputed that the defendants in submitting their bids and in selling their structural steel to the various contractors knew such steel was for use in governmental construction projects.[30] Defendants do not in fact deny plaintiffs' standing to sue at least for the amount of money spent for which no reimbursement was received. It cannot be doubted that any conspiracy, if such there was, was aimed at the various claimants in this lawsuit, among others. The claimants in fact invited the submission of bids through various announcements and advertisements. Competitive bids, if they were submitted, were prepared by reference to specifications drawn up by claimants. Considering the Federal-Aid Highway Program, 23 U.S.C. ch. 1, as the best concrete example and representative of the other Federal programs,[31] it is clear that the advertisements for bids and the construction of the highways and bridges was under the direct supervision and control of the State highway departments. 23 U.S.C. §§ 112 and 114. While such highway construction is subject to inspection and approval of the United States through the Secretary of Commerce, the Government makes no arrangements and assumes no responsibility for the purchasing of structural steel or other materials. In the highway program, the States take title to the lands and materials used in the construction and it is the responsibility of the State highway departments to maintain the highways. 23 U.S.C. §§ 107, 116. To this end, the Court of Claims recently has rejected the argument that the United States because of its 90% reimbursement is the real party in interest in a damage suit by a contractor resulting from work performed on highway projects under the Federal-Aid Highway Act.[32] As the court noted:

"The National Government makes many hundreds of grants each year to the various states, to municipalities, to schools and colleges and to other public organizations and agencies for many kinds of public works, including roads and highways. It requires the projects to be completed in accordance with certain standards before the proceeds of the grant will be paid. Otherwise the will of Congress would be thwarted and taxpayers' money would be wasted. See Mahler v. United States, 306 F.2d 713, 716–722 (3rd Cir. 1962), cert. denied, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231. These grants are in reality gifts or gratuities. It would be farfetched indeed to impose liability on the Government for the acts and omissions of the parties who contract to build the projects, simply because it requires the work to meet certain standards and upon approval thereof reimburses the public agency for a part of the costs." [33]

The court does recognize that under the target area theory no single or exclusive cause of action is created and that several "persons" may have causes of action against particular defendants for antitrust violations. Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 364–365 (9th Cir. 1955); State of Missouri v. Stupp Bros. Bridge & Iron Co., 248 F.Supp. 169, 176 (W.D.Mo.1965); Ohio Valley Electric Corp. v. General Electric

---

30. See Answer No. 46 to Defendants' Answers to Interrogatories of Plaintiffs, Set No. 1. While each defendant answered separately, the answers are consistent and uniform.

31. Cf. 23 U.S.C. § 112. Although there are several federal programs involved in this dispute, reference will be made only to Federal-Aid Highways Program, 23 U.S.C. Ch. 1. Both sides concede that this program reimbursing between 50% and 90% of the funds spent by the state presents the best concrete example. For a thorough discussion of this program see State of Missouri v. Stupp Bros. Bridge & Iron Co., 248 F.Supp. 169 (W.D.Mo.1965).

32. D. R. Smalley & Sons, Inc. v. United States, 372 F.2d 505, 178 Ct.Cl. 593, cert. denied, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967).

33. 372 F.2d at 507.

Co., 244 F.Supp. 914, 951 (S.D.N.Y.1965). Defendants contend that there are three possible plaintiffs in these cases; the contractors, the state governmental claimants now suing and the United States.[34] From this premise defendants argue that since the contractors and the United States cou'd have sued, and since now any such actions by those potential plaintiffs are barred by the Statute of Limitations, 15 U.S.C. § 15b, the state governmental plaintiffs are attempting to arrogate to themselves expired claims of others. Defendants also argue that plaintiffs are seeking unjust enrichment by attempting to convert the single damage remedy of the United States into a treble damage remedy for themselves.[35]

Even assuming the question primarily is evidentiary in nature and relates principally to the issue of the quantum of plaintiffs' damages, the court finds these arguments to be without merit.[36] A party suing for treble damages is entitled generally to recover for (1) loss of profits, (2) decrease in the value of investment, and (3) increased costs of business actually transacted. Atlantic City Electric Co. v. General Electric Co., 226 F.Supp. 59, 61 (S.D.N.Y.1964). Yet, as a practical matter, a suit by a governmental claimant who is a purchaser not engaged in business for profit is probably limited to the increased costs theory of damages. In this case it would be the amount of overcharge for the structural steel resulting from the price fixing conspiracy. Mr. Justice Holmes established the aforegoing principle by stating that "a person whose property is diminished by a payment of money wrongfully induced is injured in its property." Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906). In that case the City of Atlanta brought a treble damage action to recover an excessive price paid for pipe bought to extend the city's water mains. The Court held that while the City might not have been injured in its business of furnishing water, it was injured by the amount of overcharge it paid for the pipe. This principle of damage was reaffirmed recently in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 489, 88 S.Ct. 2224, 2229, 20 L.Ed.2d 1231 (1968) where the Supreme Court stated:

> "We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4."

*Hanover Shoe* involved a treble damage suit by a shoe manufacturer against a manufacturer of shoe machinery for excessive rental and royalty charges from machinery defendant had leased to plaintiff. At a special hearing prior to trial,

---

34. Defense counsel at oral argument stated:
    "But the most important thing I believe here is that, and the proper way to approach the question, is to determine whether or not the United States could have sued and had they showed an alleged overcharge and proved it up through the series of transactions or chain of transactions whether they would have been entitled to recover damages." Transcript of Proceedings on April 9, 1969 at p. 40.

35. For illustrative purposes, defendants hypothesize a construction project financed to the extent of 50% of its costs by the federal government. Assuming, defendants say, actual antitrust damages of $10,000, a claimant could recover trebled damages of $30,000. Defendants contend that this would result in the claimant receiving a windfall in the form of fivefold damages of $25,000. If the United States were a party it would be limited to single damages of $5,000 corresponding to its actual total damage, since it contributed 50%. So defendants suggest that the court first ascertain the federal government's economic interest before entering judgment. On the above facts, defendants contend that the proper judgment would be $20,000, i. e., $5,000 claimant's trebled damages and $5,000 actual damage for the United States.

36. The above argument was rejected continually in the *Electrical* cases *infra* note 42.

the defendant asserted the passing-on defense arguing that plaintiff had not been "injured" within the meaning of Section 4 in that any illegal overcharge was reflected in the price of shoes sold to plaintiff's customers. This argument was rejected as a matter of law.[37] After a trial on the merits and a judgment for plaintiff, the validity of the passing-on defense was presented to the Supreme Court. The Court upheld the rulings of the lower courts that the defendant was not entitled to assert the passing-on defense.[38] The Court stated that it was "not impressed with the argument that sound laws of economics require recognizing this defense."[39] The Court noted that many factors influence the price of a product and that merely because the increased price was passed-on to customers did not mean that the plaintiff was not injured in his business or property. The Court concluded that in the normal case the burden of proving that an overcharge did not injure the plaintiff would be "insurmountable."[40] On the other hand, even if this burden could be met by defendants, the Court found strong policy reasons for denying the passing-on defense:

> "[I]t is not unlikely that if the existence of the defense is generally confirmed, antitrust defendants will frequently seek to establish its applicability. Treble-damage actions would often require additional long and complicated proceedings involving massive evidence and complicated theories.

In addition, if buyers are subjected to the passing-on defense, those who buy from them would also have to meet the challenge that they passed on the higher price to *their* customers. These ultimate consumers, in today's case the buyers of single pairs of shoes, would have only a tiny stake in a lawsuit and little interest in attempting a class action. In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them. Treble-damage actions, the importance of which the Court has many times emphasized, would be substantially reduced in effectiveness."[41]

The action of the Supreme Court in *Hanover Shoe* in denying the passing-on defense was consistent with the earlier lower court decisions denying the passing-on defense in the *Electrical* cases.[42] These cases involved various treble-damage actions by public utility companies who had purchased steam turbine generators at an allegedly illegally inflated price due to a price fixing conspiracy on the part of defendants. The *Atlantic City Electric* case[43] arose over objections to interrogatories where the defendants attempted to show that the higher prices paid for the generators had been passed on to plaintiff's customers through higher rates fixed on a larger rate base. Judge Feinberg held that such evidence would be inadmis-

37. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 185 F.Supp. 826, 829 (M.D. Pa.1960), aff'd per curiam on interlocutory appeal, 281 F.2d 481 (3rd Cir.), cert. denied, 364 U.S. 901, 81 S.Ct. 234, 5 L.Ed. 2d 194 (1960).

38. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). For a thorough analysis see E. Pollock, Automatic Treble Damages and the Passing-On Defense, The Hanover Shoe Decision, 18 Antitrust Bull. 1183–1197–1199, 1213 et seq. (1968).

39. 392 U.S. at 492, 88 S.Ct. at 2231.

40. 392 U.S. at 493, 88 S.Ct. 2224.

41. 392 U.S. at 493–494, 88 S.Ct. at 2232.

42. See Ohio Valley Electric Corp. v. General Electric Co., 244 F.Supp. 914 (S.D. N.Y.1965); Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 335 F.2d 203 (7th Cir. 1964), aff'g, 225 F.Supp. 332 (N.D.Ill.1963); Atlantic City Electrical Co. v. General Electric Co., 226 F. Supp. 59 (S.D.N.Y.1964), interlocutory appeal denied, 337 F.2d 844 (2nd Cir. 1964); Public Utility Dist. No. 1 of Chelan County, Wash. v. General Electric Co., 230 F.Supp. 744 (W.D.Wash.1964).

43. 226 F.Supp. 59 (S.D.N.Y.1964), interlocutory appeal denied, 337 F.2d 844 (2nd Cir. 1964).

sible as a matter of law and sustained plaintiff's objections to defendants' passing-on interrogatories. In a thorough analysis of the law of passing-on, the court first noted that earlier Supreme Court opinions had indicated that the passing on of an illegal overcharge was no bar to recovery.[44] The court did recognize that the *Oil Jobber Cases*[45] in the Seventh and Eighth Circuits had allowed a passing-on defense, but thought these cases were distinguishable, and, in any event, were "inconsistent with what appears to be more compelling authority."[46] The court concluded that strong policy reasons dictated a denial of the passing-on defense:

> "Defendants maintain that if plaintiffs are permitted to recover treble damages notwithstanding the passing on of the overcharges, they will receive a 'windfall.' Defendants are hardly in a position to urge this objection since recognition of the passing-on defense will result in a windfall to them, and if there is to be a windfall

44. 226 F.Supp. at 63–65. See Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906); and Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918) (Interstate Commerce Act). Judge Goodrich in denying the passing-on defense in *Hanover Shoe, Inc.*, supra, note 37, also relied on the above two Supreme Court cases. His decision has been criticized to the extent that he did not cite Keogh v. Chicago & N. W. Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) by E. Pollock, supra, note 38, at 1198–99. Judge Feinberg, however, goes into this problem and demonstrates that any reliance on *Keogh* is misplaced for the only question in *Keogh* was whether a cause of action was stated under the antitrust laws and that any dictum in the *Keogh* opinion written by Mr. Justice Brandeis was later repudiated in Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184 (1932).

45. Twin Ports Oil Co. v. Pure Oil Co., 119 F.2d 747 (8th Cir. 1941), cert. denied, 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516 (1941); Leonard v. Socony-Vacuum Oil Co., 42 F.Supp. 369 (W.D.Wis. 1942), appeal dismissed, 130 F.2d 535 (7th Cir. 1942); Northwestern Oil Co. v. Socony-Vacuum Oil Co., 138 F.2d 967 (7th Cir. 1943), cert. denied, 321 U.S. 792, 64 S.Ct. 790, 88 L.Ed. 1081 (1944); Clark Oil Co. v. Philips Petroleum Co., 56 F.Supp. 569 (D.Minn.1944), aff'd, 148 F.2d 580 (8th Cir. 1945), cert. denied, 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437 (1945).

These cases were treble-damage suits brought by various jobbers who had purchased gasoline from the defendant oil companies. The passing-on-defense was allowed due to the fact that the defendants controlled not only the price of gasoline sold to plaintiffs but also the resale price of gasoline sold to plaintiffs' service station customers. Because of this fixed market price, it was held that plaintiffs' margin of profit had remained unimpaired and that therefore the plaintiffs had suffered no pecuniary injury.

The holdings of these cases have been criticized. See Clark, The Treble Damage Bonanza: New Doctrines of Damages in Private Antitrust Suits, 52 Mich.L.Rev. 363, 404–06 (1954); Comment, 61 Yale L.J. 1010, 1022–23 (1952); Comment, 18 U.Chi.L.Rev. 130, 135–38 (1950). Judge Goodrich in writing the 1960 *Hanover Shoe* decision was well aware of this criticism. 185 F.Supp. at 830–831, note 10.

46. 226 F.Supp. at 70. The validity of the holdings of the *Oil Jobber Cases* has been criticized by several others in addition to Judge Feinberg. See Note 45, *supra*. Judge Feinberg's belief in the doubtful validity of the *Oil Jobber Cases* was strengthened by what the Supreme Court said in the 1968 *Hanover Shoe* decision: "At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower." 392 U.S. at 489, 88 S.Ct. at 2229. In addition, "the mere fact that a price rise followed an unlawful cost increase does not show that the sufferer of the cost increase was undamaged." 392 U.S. at 493, 88 S.Ct. at 2231, note 9. The *Oil Jobber Cases* proceeded on the assumption that plaintiffs had suffered no loss of profits because any overcharge was passed on to the service stations in the form of higher prices. *Hanover Shoe* teaches that a plaintiff nevertheless may be damaged even though the overcharge is passed on in the form of higher prices.

One author, however, has interpreted *Hanover Shoe* as a reaffirmation of the *Oil Jobber Cases*. See E. Pollock, Automatic Treble Damages and the Passing-on Defense: The Hanover Shoe Decision, 18 Antitrust Bull. 1183 (1968).

in any case, it is plaintiffs, and not defendants, who should receive it. * * * Were the consumers a proper party in these proceedings, it might be urged by defendants that the Court should equitably distribute the damages between the utilities and the consumers * * * but when the only parties to the suit are the equipment manufacturers and the immediate purchaser-utilities, the manufacturers should not be able to prevent the utilities from recovering from them the amount of the overcharges because the utilities have passed them on to the ultimate consumers in the form of higher rates. * * *

* * * * * *

Finally, the most significant consideration is the strong policy in favor of private treble-damage actions, which are intended not only to compensate those injured by violations of the antitrust laws, but also to function as an independent method of enforcing antitrust policy. * * *" [Footnotes and citations omitted] [47]

These policy considerations were relied on later by the Seventh Circuit in the similar case of Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.[48] The Seventh Circuit had denied intervention by the State of Illinois on behalf of the consumers of the electricity.[49] Therefore, as in the case at bar, there was no danger of suit by others along the chain of injury. The Seventh Circuit thus said:

"The risk of multiple liability on the part of defendants has been excluded. To apply the pass-on defense in these circumstances would be tantamount to immunizing defendants from liability.

The immunization of defendants from liability would frustrate the purposes of the antitrust laws. Section 4 of the Clayton Act was designed not only to vindicate private wrongs but to aid enforcement of the antitrust laws. United States v. Borden, 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954). The deterrent effect inherent in private treble damage actions would be destroyed if the nonliability rule for which defendants contend were recognized." [50]

In Ohio Valley Electric Corp. v. General Electric Co., 244 F.Supp. 914 (S.D.N.Y. 1965) the validity of the passing-on defense was again before Judge Feinberg. Plaintiff OVEC supplied electric power to a plant owned by the Atomic Energy Commission (AEC). OVEC had been established by a consortium of utility companies to construct and supply electric power to AEC because of the large supply of electricity needed for a nuclear plant. The utility company sponsors provided capital and arranged for debt financing. Rates were established to compensate OVEC for its costs, amortize its outstanding debt on purchased equipment and provide a fixed return on capital. OVEC sued defendants for a price fixing conspiracy as to the steam turbine generators purchased by plaintiff. The defendants argued that the increased cost of the generators (the overcharge) had been passed on to AEC, OVEC's customer. The court, following Atlantic City Electrical Co. v. General Electric Co., 226 F.Supp. 59 (S.D.N.Y.1964) again rejected any assertion by defendants of the passing-on defense. In his

47. 226 F.Supp. at 70, 71. The Court does mention the evidentiary problems involved in allowing the passing-on defense. In the case at bar these evidentiary problems are missing. However, that the decision was firmly rooted in the various policy considerations discussed is seen by Judge Feinberg's subsequent opinion in Ohio Valley Electric Corp. v. General Electric Co., 244 F.Supp. 914 (S.D.N.Y. 1965) which is discussed *infra*, Note 51.

48. 335 F.2d 203 (7th Cir. 1964).

49. Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 315 F.2d 564 (7th Cir.) cert. denied, Illinois v. Commonwealth Edison Co., 375 U.S. 834, 84 S.Ct. 64, 11 L.Ed.2d 64 (1963).

50. 335 F.2d at 208.

opinion Judge Feinberg mentioned the possibility that AEC might have maintained a suit. He made the following comments applicable here:

"Plaintiff utilities here have only one large customer (the AEC) * * * to whom all of their product (electricity) is sold. In such a case—where a utility's entire output is sold to one customer and the customer has paid rates which include a component based upon an illegal overcharge to the utility—that one customer may also have a right to bring suit for the antitrust violation and, equally important, may be in a practical position allowing it vigorously to assert such claims. * * * Where there is such a customer, or group of customers, with the ability to sue the turbine manufacturers, it may be necessary to protect the manufacturers from the possibility of multiple liability. But such is not the case here. Neither the United States nor the sponsoring companies threatens defendants on the claims asserted by OVEC and IKEC; in fact, they have settled all outstanding civil claims against defendants and at no time in the settlement negotiations did any party take the position that the OVEC and IKEC claims properly belonged to the AEC or the sponsoring companies. Therefore, allowing passing-on as a defense

on this record would, without question, eliminate defendants' liability to anyone for a serious antitrust violation." [footnotes omitted] [51]

■■ The case at bar is similar to the *Electrical* cases. Neither the United States nor the contractors have sued defendants. There appears no likelihood that either of these parties will so sue and all parties to this lawsuit seem agreed that in any event such claims are barred by the Statute of Limitations. Thus there is here absolutely no fear of multiple litigation or liability. While the court need not decide whether the United States could have sued, the court does believe it has sufficient protective devices at its disposal to protect defendants from multiple liability if such a threat should occur. For example, in this case already defendants have been protected from multiple liability to some extent by this court's ruling under Rule 23 of the Federal Rules of Civil Procedure as to the appropriate classes.[52] Under certain circumstances intervention or joinder of other parties might be appropriate—or even necessary—to minimize piecemeal litigation and the danger of multiple liability.[53] Further, defendants generally are now protected at least to some extent under the recently enacted Multidistrict Litigation Act, 28 U.S.C. § 1407.[54]

51. 244 F.Supp. at 951. One author has stated that the *OVEC* case has been impliedly overruled by Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). *See* E. Pollock, Automatic Treble Damages and the Passing-on Defense: The Hanover Shoe Decision, 18 Antitrust Bull. 1183 (1968). The court feels that the *OVEC* result is sound and that it has not been impliedly overruled. *OVEC* did not involve a cost-plus guarantee situation but rather an amortization where the utilities were guaranteed their money back over a four year period of time. The court in *OVEC* was well aware that the plaintiff utility would recoup its investment, but the court also noted that "most utilities, while not legally guaranteed a return by their customers, are, in effect, practically assured of a return

on investment so that sooner or later costs are recouped." 244 F.Supp. at 951.

52. State of Minnesota v. United States Steel Corp., 44 F.R.D. 559 (D.Minn. 1968).

53. *Cf.* Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967).

54. See In re Protection Devices and Equipment and Central Station Protection Service Antitrust Cases, 295 F.Supp. 39 (Panel Mult. Lit. 1968); In re Antibiotic Drugs, 295 F.Supp. 1402 (Panel Mult. Lit. 1968); In re Plumbing Fixtures, 298 F.Supp. 484 (Panel Mult. Lit. 1968); and In re Fourth Class Postage Regulations, 298 F.Supp. 1326 (Panel Mult. Lit. 1969). See also City of St. Paul v. Harper & Row Publishers, Inc., 292 F.Supp. 837 (D.Minn.1968).

The *Hanover Shoe* decision, to be sure, did not eliminate completely the passing-on defense. The Supreme Court said:

> "We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present."[55]

Defendants seek to place themselves within this narrow exception carved out by the Supreme Court.

The court does not believe that federal reimbursement programs to the states under various grants-in-aid and loan programs can be analogized to the cost-plus contract situation referred to in *Hanover Shoe*. Of overall significance is the fact that federal reimbursements are not typical of the normal passing-on situation where the inflated price is passed on to plaintiff's customers. This case presents suits by state governmental claimants operating on a nonprofit basis. Therefore any attempt to analyze the problem in terms of the impact on plaintiffs' profits would be misplaced. Secondly, the typical passing-on situation involves a sale, a resale and an overcharge passed on to plaintiff's customers. In the case at bar the Federal Government is not purchasing anything. In the Federal-Aid Highway Program, for example, there is no reselling of structural steel or other materials by the state highway departments. The states are not buying machinery or other commodities for resale to the Government or anybody else. The states both own and maintain the highways. The states are not sellers and the United States is not a consumer. The United States is as it were in the financing business vis-a-vis the states. In all such Federal programs money is given the states to advance the national interest of the United States and welfare of the public at-large. Had there been no price fixing (if such ulti-mately is proven) the States for instance with the same amount of money received from the Federal Government perhaps could have built another bridge, or another mile or two of highway. Again *focusing on the Federal-Aid Highway Program* as the most concrete example, that interest under 23 U.S.C. § 101(b) is:

> " * * * to accelerate the construction of the Federal-aid highway systems, including the National System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense."

An analogous situation is where a bank lends a corporation money to construct a building, or where a grantor donates money to a particular charity or other non-profit organization to construct, for example, a home for under-privileged children. If suppliers were to be guilty of price fixing in supplying materials for such construction so that an overcharge resulted, would anyone doubt that the owner of the building or the charitable organization could sue these suppliers for treble damages based on the overcharge? The court does not believe that the suppliers could defend such actions by arguing that the cost of construction, or some part thereof, had been passed on to or furnished by the bank or the grantors.

What defendants propose in this case is more aptly characterized as the "reimbursement" defense. In tort litigation this defense has been rejected continually by the courts. In Adams v. Mills, 286 U.S. 397, 407, 52 S.Ct. 589, 591, 76 L.Ed. 1184 (1932) Mr. Justice Brandeis said:

> "The plaintiffs were the consignees of the shipments and entitled to possession of them upon payment of the lawful charges. If the defendants *exacted from them an unlawful charge*, the exaction was a tort, for which the plaintiffs were entitled, as

---

55. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 494, 88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231 (1968).

for other torts, to compensation from the wrongdoers. \* \* \* *Neither the fact of subsequent reimbursement by the plaintiffs from funds of the shippers, nor the disposition which may hereafter be made of the damages recovered, is of any concern to the wrongdoers.*" [Emphasis added]

Judge Goodrich in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 185 F. Supp. 826, 829–830 (M.D.Pa.1960) surveyed the general law of torts and concluded that the reimbursement defense lacked validity. Judge Goodrich said:

"Things which happen later and let an injured plaintiff escape some of the ultimate consequences of the wrong done him do not inure to the benefit of the defendant. Thus, if a man is injured by the negligence of another and has the good fortune to have an insurance policy which recompenses him for loss, the insurance money does not reduce the damages which the wrongdoer must pay. If friends of a man against whom a tort is committed make up a purse to pay for his medical services, that does not cut down what the plaintiff may recover from the tortfeasor. Wages continued by an employer during a time when an injured man is not working do not redound to the benefit of the wrongdoer. And, likewise, if a man having sustained an injury works extra hard after his recovery and comes out at the end of the year as financially well off as he would have been without the loss of time, the wrongdoer cannot claim reduction of damages on this account." [Footnotes omitted]

In summary, defendants' attempted reimbursement defense must be rejected. In actions of this sort, the United States should not be required to protect every remote financial interest it has in its numerous grants-in-aid and loan programs throughout the country. Such a requirement would place an undue burden on the enforcement capabilities of the Government. It would result in this case in a whole series of extraneous issues in an already complex case. Establishing such a requirement would deter substantially private antitrust suits and encourage piecemeal litigation. The treble-damage action by states and municipalities can serve an important function in supplementing the Government's antitrust activities. In a similar case [56] the United States as amicus curiae took the position that notwithstanding the involvement of Federal monies, state agencies were the proper parties to maintain claims for the entire amount of damage allegedly resulting from a price fixing conspiracy in structural steel.[57] While

56. State of Missouri v. Stupp Bros. Bridge & Iron Co., 248 F.Supp. 169 (W.D.Mo. 1965).

57. The Amicus Curiae Brief of the United States in the Stupp case was filed with this court after defendants had attached to their brief a copy of a Justice Department letter to the court in the Stupp case. See Defendants' Brief, Exhibit A. The letter indicates that at least in the Federal-Aid Highway Program the Government through post-audit procedures will participate in the form of a credit in any recovery made in this case. The Justice Department letter reads in part: "[T]he nature of the auditing procedures governing the relationship between the Bureau of Public Roads and the State Highway Department assures that the United States will be credited with the proper portion of any moneys recovered by the State as overcharges. \* \* \* Any recovery by the State of Missouri of overcharges for structural steel in this case, to the extent of actual damages, would be considered a reduction in the costs of that item of expense for which federal reimbursement had been made, and the State's account would be charged with the applicable percentage of the recovered overcharge. We believe that this procedure protects the United States, that it is understood and agreed to by the State, and that it obviates the need for impressing a constructive trust on any recovery that might be awarded to the State of Missouri. Since we further believe, for the reasons set out in our *amicus* brief, that the State has standing to assert the entire claim for overcharges, we are satisfied that the interests of the United States are in fact protected by this suit."

The court does not believe that defendants are in position to claim benefit to any

nothing said today is meant to prevent the United States from taking a contrary stance, the court believes this position to be sound. There are numerous Federal programs which provide for matching grants of Federal monies in support of various projects undertaken by state and municipal bodies. These programs are undertaken to further the national interest and to benefit the public. They are not a shield behind which an antitrust violator can hide. No useful purpose would be served if issues concerning the multitude of intergovernmental relationships and programs were injected into this complex antitrust case.

Accordingly plaintiffs' objections to Interrogatory 6 of Defendants' First Set of Interrogatories will be sustained. A separate order has been entered.

contractual relations or administrative procedures existing between the States and the United States Government.

Of course, nothing expressed herein binds or in any way affects the position of the United States which is not a party to this case.